ing the forgery only to the extent of the advances made on the faith of his statements which was all that could be recovered.

[3] The plaintiff also urges that the guaranty of the indorsements by the defendants is equivalent to admissions of the genuineness of their signatures as indorsers of the notes, and that such admissions are sufficient evidence upon which to support a judgment against them for the amount of the notes. But, if the instruments fail as guaranties, it seems to me that they cannot be effective as admissions for the purpose of evidence, for in neither aspect are they supported by a consideration, and the defendant did nothing and lost nothing because of them. If they are ineffective for one purpose, they are for the other, and for the same reason. The complaint should be dismissed, with costs.

Judgment accordingly.

FEARON v. NEW YORK LIFE INS. CO.　(No. 5648.)

(Supreme Court, Appellate Division, First Department.　May 15, 1914.)

1. MASTER AND SERVANT (§ 182*)— INJURY TO SERVANT—FELLOW SERVANTS.
　　Where a fireman and coal passer in a building were subject to the orders of a third person, and the fireman could merely suggest to the coal passer as to the order in which the work should be done, the fireman was but a coemployé of the coal passer, and the employer was not liable for the negligence of the fireman causing injury to the coal passer.
　　[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 371, 372; Dec. Dig. § 182.*]

2. APPEAL AND ERROR (§ 1050*)—EVIDENCE (§ 359*)—PREJUDICIAL ERROR.
　　In an action for negligent death, the admission in evidence of a photograph of decedent and his children, taken about six months before decedent's death, was erroneous because calculated to arouse the sympathy of the jury and influence them in weighing the testimony on the main issue.
　　[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153–4157, 4166; Dec. Dig. § 1050;* Evidence, Cent. Dig. §§ 1509–1512; Dec. Dig. § 359.*]

3. EVIDENCE (§ 527*)—OPINION EVIDENCE—TESTIMONY OF EXPERTS.
　　In an action for the death of an employé caused by an elevator hoist descending on him in the basement of his employer's building, the testimony of an expert as to what caused the hoist to descend at the time of the accident was inadmissible and the testimony must be confined to the conditions which would cause the hoist to descend, without any one operating the appliances used in its operation.
　　[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2334, 2335; Dec. Dig. § 527.*]

4. DEATH (§ 68*)—ACTIONS—EVIDENCE—ADMISSIBILITY.
　　In an action for death, evidence of decedent's habit of becoming intoxicated was admissible on his probable earnings and the financial loss of his wife and children.
　　[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 86, 87; Dec. Dig. § 68.*]

5. MASTER AND SERVANT (§ 286*)—DEATH OF SERVANT—NEGLIGENCE—QUESTION FOR JURY.
　　In a statutory action for the death of an employé by an elevator hoist descending on him in the basement of his employer's building, evidence held not to justify a submission to the jury of the issue of the employer's

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

negligent failure in not furnishing decedent with a safe place to work, in not warning him of the danger, and in maintaining a defective elevator.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. § 286.*]

Laughlin and Clarke, JJ., dissenting in part.

Appeal from Trial Term, New York County.

Action by Elizabeth Fearon, as administratrix of Bernard Fearon, against the New York Life Insurance Company. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

William Dike Reed, of New York City (Leonidas Dennis, of New York City, on the brief), for appellant.

Jeremiah A. O'Leary, of New York City (Louis Cohn and George W. Smyth, both of New York City, on the brief), for respondent.

LAUGHLIN, J. This is a statutory action to recover for the death of Bernard Fearon, which was caused by an ash hoist descending upon him in the basement of defendant's building at 346 Broadway, borough of Manhattan, New York, while he was in its employ on the night of February 5, 1912. The decedent was 46 years of age, and in the best of health. He had had considerable experience as a coal passer and fireman, and was a licensed fireman. He was employed by the defendant as a coal passer, and commenced work for it the night before he met with the accident. One Loughlin, a fireman in the employ of the defendant, and who was related to decedent by marriage, knowing that the defendant required the services of a man to take the place of one injured, brought the decedent to the defendant's building the night before the accident, and presented him to the defendant's first assistant engineer, Anderson, who was then going off duty, saying that, "Here was a coal passer," and the assistant engineer instructed Loughlin, in effect, to put decedent to work as a coal passer, and, as Loughlin was then going on duty for 12 hours, he, without further directions from the assistant engineer or any one else, assumed to assign work to the decedent as assistant to him as fireman in charge of the boilers. Loughlin testified that the first work decedent did was to wheel coal, and that the next work done was removing ashes from the fires, and that while the decedent was wheeling coal he informed decedent that he would get the ash cans, which were "on the elevator shaft," by which he meant in the vault or room under the Leonard street sidewalk in which a hoist elevator leading to the sidewalk had been installed and was operated, and he did, but that the decedent would have to get them the next night, and that they then together cleaned two fires.

The evidence shows, among other things, that the fireman was responsible for the condition of the fires and for keeping up steam, and that the duties of the coal passer were to assist the fireman, but that

the fireman was not responsible for the coal passer's work, and that they worked together in shoveling coal and feeding the fires and shaking down the furnaces and helped one another, that there was always a watch engineer on duty at night, vested with authority to give orders to the firemen, coal passers, and other employés if and when necessary, and that the firemen worked 8 hours and the coal passers 12 hours ordinarily, but they received the same per diem wages.

The decedent came to work on the night of the accident at 6 o'clock. There were on duty that night Watch Engineer Punch, who was in general charge, one Sheehan, an oiler, whose duties carried him to the engine room, the fireroom, and the pumproom, one Morgan, as fireman, and the decedent as coal passer. Morgan had been working two hours before the decedent appeared. There were three furnaces in a row in the boiler room on the basement floor. The first work decedent did that night was to wheel coal to the furnaces, and before he did so Morgan said to him, "We will start to get some coal out." Morgan then told him to clean the fire, which involved removing the ashes from under the grate and putting it into cans, which work they did together. There were in the boiler room when they started work about 30 empty ash cans. After removing the ashes from one grate they burned some rubbish, and next wheeled more coal and then cleaned another fire, and after that they started to get more coal and were about to clean the third fire. Morgan testified that the decedent then opened the door of the third furnace, and remarked that " 'it was a pretty fat fire,' pretty heavy one, he meant," and walked away towards the elevator shaft; that at that time about 26 of the 30 empty cans had been filled; that as they finished cleaning the second fire the decedent asked Morgan if he had "taken the rest of the cans out of the elevator shaft," and was informed that he had; that the accident occurred within two or three minutes thereafter, and that in the meantime he had been looking after the other fires, and had not observed that decedent had passed into the elevator room; that he gave decedent no instructions or order to go there to get empty cans, or for any other purpose, and did not know why he went there; that nothing was said with respect to where the ashes from the third furnace, over and above what would go into the four empty cans, were to be put, but that on former occasions, before decedent was employed there, when the cans were all filled, the ashes were piled in the corner of the room against two walls in a bin formed by the walls and the filled cans; and he also testified that there were at the time of the accident some other empty cans in the elevator room back of the elevator, where they were customarily put by the employés of the contractor who removed the ashes from the building. There is other testimony to the effect that defendant had 50 or 52 ash cans in all, and that the empty cans were left in the elevator room back of the elevator by the employés of the contractor who took up and emptied the full cans and brought the empties back down on the elevator; and that evidence also tends to show that there were, at the time of the accident, empty ash cans in the elevator room back of the elevator shaft proper. Other evidence also tends to show that one of the duties of the coal passers was to take the empty ash cans from the elevator room into

the boiler room, and that it was to the knowledge of defendant's super-intendent the custom, and it had not forbidden passing back and forth across the elevator pit in so doing; and one witness testified that an ice box on the east of the elevator so narrowed the passageway on that side that sufficient room was not left to carry the cans around the elevator pit on that side. It quite plainly appears that the ash cans could not have been carried around on the westerly side. There is no evidence that decedent knew of the custom of storing the sur-plus ashes on the floor in the boiler room. Nor is there any evi-dence, other than herein stated, that he was given any instructions with respect to his duties, or that he knew or was informed of the conditions in the elevator room, or with respect to the elevator or its operation.

The defendant's building is at the southeast corner of Broadway and Leonard streets. The hoist elevator shaft proper, which is not inclosed, is about 5 feet square, and is in a vault or room 11 by 12 feet in di-mensions under the sidewalk and near the building line. This vault under the walk is connected with the boiler room and basement of the building by a sliding door in an opening 4 feet 8½ inches in width. The distance from the hoist elevator to the nearest boiler is about 24 feet. The passageway from the hoist to the boilers leads between two columns 15 feet apart, which were somewhat nearer the elevator room than the boilers. On one of these was a 16 candle power electric light which shone through the sliding door into the elevator room. This light was on the stanchion to the west of the sliding door, and, owing to an intervening obstruction caused by the wall of the building and a partition, it cast some light directly on the east side of the room in which the elevator shaft was and across part of the pit, but only re-flected light on the west side and the elevator or elevator pit, and ma-chinery to the west could not plainly be seen. The elevator was of the hydraulic plunger water pressure type, and was operated by pulling a chain which opened and shut a valve controlling the raising or lower-ing of the elevator by letting the water flow in or out. There was a pit 9½ inches in depth below the floor of the elevator room into which the elevator descended, so that when the elevator was down the surface of the platform was level with the floor of the room. From the bot-tom of the pit four spuds about 1½ inches in diameter, which appar-ently served as supports for the elevator when down, projected up to a height of 2 or 3 inches. When down, the elevator could be started by pulling the chain at the westerly side of it, or by revolving the drum or sheave wheel around which the chain wound, and which was within reach by hand; but when the elevator was at the street level, it could be started by pulling the chain or revolving the drum from below, or by pulling a ring in the floor of the elevator from above. The height of the elevator shaft from the floor to the street level was 16 feet and 7 inches. In cold weather it was customary to leave the elevator at the street level, as that tended to keep out cold air.

Morgan used the elevator about 1½ hours prior to the accident to go to the street, and when he returned he sent it up to the street, ei-ther by pulling the chain or turning the drum; but Sheehan also used

it for the same purpose about the same time, and he left it up at the street level, and saw it there again about half an hour prior to the accident. If the decedent passed from the boiler room through the sliding door with a view to getting empty ash cans from back of the elevator shaft, his direct course led across the elevator pit, but he could have turned to the right, where there was floor space between the wall and the elevator guide rail at the southeast corner of the elevator shaft of 2 feet and 1 inch, but, as already observed, there is testimony to the effect that it was partly obstructed by an ice box. He could, of course, if he knew how, but that does not appear, have brought the elevator down and have walked across the platform thereof. He was found face downward, with his feet and body in the pit under the elevator platform at the west side, with his head extending to the northwest and resting on a horizontal water pipe, which apparently was a foot or so above the floor, and his left arm extended in a southerly and his right arm in a northerly direction, with his right hand almost touching the empty ash cans back of the elevator, and with his body jammed against the chain in the pit, so that the chain could not be pulled to operate the elevator and move it off his body. The power of the elevator was still on, and the elevator was exerting a pressure on the body of the decedent, and to relieve this, and to extricate the body, the water was turned off at a stop valve, which left merely the weight of the elevator platform to be lifted off the body.

The negligence charged, and upon which the learned counsel for the respondent claims that the verdict may be sustained, is in not furnishing the decedent with a safe place within which to perform his duties, in not warning him of the danger, in not properly lighting the place, and in maintaining a defective elevator. There is evidence tending to show that the elevator could be accidentally started by merely touching the drum, or by any slight movement of the chain. Other evidence tends to show that this elevator was in such condition, to the knowledge of the chief engineer, that it had, for a period of several months prior to the accident, started from the top without being set in motion by human agency, and settled or sagged down to the bottom of the pit, and that it would start after remaining stationary at the sidewalk for some time, and that this was caused by a leak in the valve, or in the packing of the piston, and that it would thus lower itself the entire distance in about two minutes, and that when set in motion by pulling the ring or chain, and thus opening the valve to let the water out, it would go down in about one minute. There is also evidence that when the elevator was at the sidewalk any one from there could, by reaching over an iron bar or rod 32 inches high, or by removing it, pull the ring and lower the elevator, and that children could and did pull the ring and send it down, and frequently in cold weather children congregated there for warmth. There is evidence that there was an extension light, consisting of an electric light on a long electric cord, which was kept some 40 feet from the elevator room in the fireroom; but there is no evidence that the decedent's attention was drawn to this, or that he knew of its existence. The evidence to which reference has been made is not uncontroverted; but this is a sufficient

statement of the case, I think, to show that it was one for the jury, on the theory of negligence in failing properly to instruct plaintiff, or to warn him of the danger, or to furnish him a safe place within which to perform his duties, and the jury might have found on the evidence that decedent entered the elevator room in the discharge of his duties to get empty ash cans, as he had been instructed the night before by Loughlin would be his duty, and that he stumbled and fell in the elevator pit, owing to insufficient light, and thus accidentally started the elevator down, or that it was started down by pulling the ring exposed on the sidewalk, or started owing to its defective condition, and caught him before he got up if he fell, or while crossing the pit if he did not fall. No opinion is expressed with respect to the weight of the evidence on these points, but merely that appellant is not entitled to have the complaint dismissed on his motion at the close of the evidence.

[1] We find, however, some material errors in the record prejudicial to the rights of the appellant, and which require a new trial. Under the charge of the learned court the jury were permitted to find a verdict for the plaintiff if they found that the fireman, Morgan, "was acting as superintendent, and was intrusted with superintendence," and was guilty of negligence in giving instructions to the decedent which the latter was following at the time he met with the accident. Counsel for the appellant separately requested the court to charge the jury that as mater of law Morgan was acting as a fellow servant, and that:

"If the accident occurred through any negligence of Morgan or Sheehan in the operation of the elevator, just prior to the accident, it was the act of a fellow servant of the deceased, and plaintiff cannot recover."

To each of these refusals to charge an exception was duly taken. I am of opinion that the appellant was entitled to the instructions requested. All material evidence with respect to Morgan's duties and authority has been stated, and it does not show that he was intrusted with superintendence, or was performing the duties of a superintendent, or that he gave any negligent order to the decedent. He had no authority to give orders. Punch was the immediate superior of both, and he was on duty at the time, and he alone was authorized to give orders. Subject to an appeal or orders from him, the fireman and coal passers were expected to work together, and what is claimed to have been orders from the firemen were merely suggestions as to the next work to be done in order to keep the fires in proper condition; and, while it may be conceded that it was for the fireman to determine the *order* in which the coal passer was to perform his duties, the evidence would not warrant a finding that the fireman had supervision over him while performing his duties. Morgan, therefore, was a coemployé. Moreover, as already stated, there is no evidence that Morgan gave the decedent any negligent order, or directed the decedent to go into the elevator shaft, and he must have gone there for purposes of his own, or pursuant to what was said to him by Loughlin the night before.

[2] I am also of opinion that an error was committed in receiving a group photograph of decedent and two of his children. It does not

appear that the attention of the court was called to the fact that the photograph contained the pictures of the children as well as that of the decedent, and it is quite likely, from the manner in which it was offered, that the court was led to believe that the defendant merely intended to suggest for the consideration of the court the incompetency of the photograph, without intending formally to object thereto, for defendant's counsel admitted that it was a correct photograph, taken six months prior to the death of the decedent, and merely stated that he did not consent to its admission, and that he thought it was incompetent, irrelevant, and immaterial, and he did not take an exception to its introduction until after the reception of other evidence. The admission of such a photograph would naturally be prejudicial to the appellant on the question of damages at least (Smith v. Lehigh Valley R. Co., 177 N. Y. 379, 69 N. E. 729). And, I think that it was also calculated to sway the sympathy of the jury and to influence them in weighing the testimony on the main issue.

[3, 4] There were other errors committed in permitting an expert for plaintiff to testify, not what conditions would cause the elevator to lower without pulling the ring or using the chain or turning the drum, but as to what, in his opinion, caused it to fall on the occasion in question, and in the rejection of evidence with respect to decedent's habit of becoming intoxicated, which bore on his probable earnings and was competent on the question of the financial loss sustained by his wife and children. It should be sufficient to draw attention to these errors without discussing them in detail to prevent a repetition of them on a retrial.

It follows that the judgment and order should be reversed and a new trial granted, with costs to appellant to abide the event.

CLARKE, J., concurs.

INGRAHAM, P. J. [5] I concur in the reversal of this judgment on the ground that the evidence did not justify a submission of the case to the jury. I also agree that the errors pointed out by my Brother LAUGHLIN are such as to require a reversal.

McLAUGHLIN and SCOTT, JJ., concur.